Good morning, Your Honors. May it please the Court and Counsel, the central question on this appeal is whether appellants provided sufficient proof that but for the union's bad faith, the misrepresentations, and concealment that was made to members regarding the 2018 CBA, whether the members would have voted against ratification of that CBA. More specifically, and in light of the District Court's ruling, the unique question that is before this Court is whether that standard requires a vote-by-vote accounting of how every individual member may have voted on the CBA, or whether this Court should consider the totality of the circumstances, the entire record in that case, whether the loss of 30 and out was a wedge issue with the capacity to drive hundreds of votes one way or the other. Do you agree, Counsel, though, that if it's a count-by-count or a vote-by-vote count that you probably lose and that the District Court was right? Because I read the evidence as saying you can't actually overcome it, no matter how you count, with the evidence you have in the record. There's a couple of reasons to question that finding. The largest one is that the vote itself, a 119-vote margin, is not an accurate depiction of the members' sentiment at the time of the vote. Why is that? Because the members did not know what they were voting on to begin with. As I understand it, the record at the District Court indicates that there hasn't been evidence to show what this groundswell of opposition, how it could be measured by people filing affidavits, people putting in some statements, how their vote would have been different had they known about the 30 and out, that there's just, what, nine or so, less than a dozen or so, that are actually in the record indicating that their vote would have been different. Well, there are a number of additional sources besides those nine that are taking reasonable inferences from the summary judgment record would overwhelm that 119-vote margin. What's in the what, would you tell us what that is in the record? Certainly. There are 13 declarations in the summary judgment record from various appellants in the case discussing their own interactions with their coworkers and how, and particular coworkers that they would have lobbied, identifying those coworkers by name in several instances and also discussing their efforts to lobby other coworkers to vote against the CBA had they the opportunity to do so. There is the Facebook group that showed, that has 150 participants, approximately 67 members of that Facebook group could be cross-referenced with the voter rolls, people who did not vote at all. But that's all they did was join the Facebook page, right? That's true, but it also reflects that their intent, had they known at the time... Are you sure it wasn't just the union leadership watching what's going on in the Facebook page? I'm sorry, what was the question? Are you sure it didn't include union leaders and those sympathetic to union leaders who are just watching what's going on in the Facebook page? There is no way to confirm that one way or the other. The only thing that we can do... Okay, so it's summary judgment and there's no evidence. Go ahead. The only thing we can do taking reasonable inferences from our summary judgment record in favor of the appellants is that there are a number of people, 67 people, who did not vote at all, who chose to join this particular Facebook group that was marshaled in opposition to the elimination of this 30 and up benefit. The problem with that, I'm going to give you the credit that every member of the Facebook page would have voted differently. We're still at 215 to 185 in favor of the measure. We went through and we did the calculation. I'm still trying to figure out... I'm going back to my original point. It sounds to me like the issue, it's not a heads I win, tails you lose situation. If you do a vote by vote count, you lose. If you take a totality of the circumstances, then we should reverse summary judgment. That's really what I'm trying to get at. I'm trying to figure out what's in the case and what we can dispense with. That is precisely the legal issue, Your Honor. If this Court chooses to go strictly by simple math to use the term that was adopted by the Pruder Court, yes, that would be determinative in favor of the union. Okay. The analysis that is being urged here, the analysis that, frankly, this Court has not dictated one way or another, is whether this Court should step beyond that simple math and actually look at the complete evidence of what would determine the sentiment of the membership as a whole. Simple math doesn't accurately capture how people would have voted, in part because there is a great deal of evidence showing that the vote doesn't ... that the people who voted didn't know what they were voting on. I don't seem to have any precedent to address this specific legal question. What good persuasive authority do you cite to us for reversal? We are relying on the Pruder v. Local 210 case from the Southern District of New York. The Court there rejected the, quote, simple math. It found taking reasonable inferences for the members, a, quote, critical issue for a large block of members. It found, quote, that others would have been swayed. The Court there was not strictly focusing on the math. They had 87, though, right? Pardon me? They had 87 who said that they would do something about it, right? Yes. It was close. Right. It was close. And that benefit affected everybody, the union leaders, the newly hired, everybody. Right. And Pruder? That's also true. Right. And yours affects 12 percent. Yes. But one of the things that this Court should also consider when taking those numbers into account, the number of people who participated in the vote total, approximately 350 people. The number of people affected by the elimination of 30 and out was vastly more than that, approximately 800 people. So it would be the people who couldn't enter a 30 and out or those who were already in the pipeline, so to speak, of early retirement. That's based on the number of people, based on an examination of the voter rolls. It's essentially at the count of the class members. If the Court looks at the class certification record as well as the summary judgment record, the count of people who would have lost the elimination, people who were not grandfathered, that's approximately 800 people. That's a critical mass. That's a mass that overwhelms the number of people who actually participated in the ratification vote. And the Court also needs to look beyond just the pure numbers to how the union itself viewed this issue. One of the things that the District Court neglected to do in examining this summary judgment record was to consider the question, why? Why did the union conceal this information? What was its motivation for doing so? Before you get there, can I just ask a quick question to follow up on the Chief, which is I want to understand the 800, which is, I assume it includes like 30-year-olds, right, who have been there three or four years, so they're not, you know, and at some point they may be subject to the 30-and-out rule, but, I mean, conceivably, they would have also been very attracted to the variable annuity and the other things. I'm just trying to figure out who's included. Is it people about to hit retirement or could it be these 30-year-olds who really probably don't care about the 30-and-out rule? That is a question that the record does not answer. Okay. What the Court can reasonably infer based on what is in the record is that the 30-and-out program was actually cabined under prior CBAs so that the youngest workers weren't part of the 30-and-out program at all. So the class members, the people who actually qualified for the benefit was that approximately 800 people who either had accrued significant time or were in a position to accrue significant time. That was a valuable benefit to them. The specific issues about whether it was important enough takes us back to the question of why did the union conceal this information from its members? And that's where, that's what takes this. Is concealment itself not in dispute? There are disputes there regarding bad faith and the nature of the concealment. However, on this summary judgment record, appellants take the position that bad faith is amply shown. Surely that's disputed, counsel, right? Pardon me? This is a union dispute. I'll talk a little louder. Surely that's disputed on this record with a fair representation claim, right? It is. Yeah, proceed. So going back to the question of why, what would motivate a union to act in bad faith under these circumstances? And that takes us back to the pattern of concealment, of reassuring members through public statement, falling on the sword, pulling the pin, mutiny, all of these terms that showed that the union itself did not have confidence that it was going to be able to procure ratification unless this information was withheld from members. That's what, when this Court will take the hundreds of people impacted, plus the fact that the ratification proceeding did not fully or accurately inform the membership at all, making that vote a sham, making it a poor reflection of member sentiment if it was one at all. Counsel, it seems, given the strength of what you described, it seems like it would have been much, there would have been much more of a groundswell of interest, people filing affidavits, people indicating and being a part of that number that now the Court looked at as under 20, that would indicate there was this huge sense that there was a fraud, in essence, taking place upon them. Well, that goes to the key question at the outset. Does this, does the duty of fair representation demand a vote-by-vote accountant or not? If this Court, construing a judicially implied doctrine, reaches the conclusion that that's necessary, that there needs to be a poll of a determinative number of individuals to establish that that margin can be overcome, that then, then it's true. The summary judgment record is not going to satisfy that standard. But the cost involved to even conduct such a poll, to reach out to dozens, hundreds of members, really blows this out of the water. It would effectively deprive the persons harmed in this case or any sort of punitive class from vindicating their rights. And what did the, just to help me with the record, I read the briefing, but my recollection is unsteady on this. What, how did the union communicate the content of the CBA before the vote? Was there, was, how could an interested union member read the contents of the CBA prior to voting to approve it? The record is clear on that. They couldn't. They didn't get it. If they could have gone to a meeting and asked a question, right? Well, even at the meeting, they refused to disclose what the content of the CBA was. The union's very consistent. It's showing up the communications workers' testimony, right? What you're getting is? The communications director said that if, testified, and the union consistently directed that if members wanted to find out what was in the CBA, they had to show up at the ratification vote. Right. And that there was no. And the Constitution and Bylaws of the union don't require anything different. As you know, some Constitution and Bylaws require all kinds of advance notice and meetings and votes during negotiations if the union leadership thinks it's important. And this didn't require anything like that, right? No, but that doesn't excuse misrepresentations to the members, misrepresentations during the ratification vote about what the substance of the CBA was. And that goes to the heart of the case. I'm going to reserve my remaining time. Thank you, Mr. Moriarty. Thank you. Mr. Louris. Thank you, Your Honors. May it please the Court, Counsel. The district court's decision granting summary judgment in favor of the defendant must be affirmed because the plaintiffs cannot prove the essential element of causation on their duty of fair representation claim. Counsel, while it's fresh on our minds, would you address the last question we posed to your opponent, which dealt with the nature of the disclosure of the contents of the CBA to the union members? Yes, Your Honor. It is undisputed on this record that the union provided written materials at the ratification meeting available to all members in attendance that specifically explained in easy-to-read, bullet-point fashion all of the changes to the pension plan, including the limitations to the 30 and out. Lead Plaintiff Matthew Nagel admitted in his deposition that he received and reviewed that document at the ratification meeting, and if he had not lost his ballot, he would have voted against the contract based on receipt of that information. The union also provided its pension consultant. The pension plan administrator was present at the ratification meeting as a resource to members who may have had questions on the changes or just to inform them about what the changes were. But there is no dispute on this record that written information was provided and available to all members at the ratification meeting, which is what's required by the agency. Was there any other source or opportunity for non-present members to obtain information about the CBA? Not about the actual terms of the tentative agreement that had only been reached two days prior. Back to causation, the district court correctly ruled in this case that the plaintiffs cannot establish that the outcome of the ratification vote would have been different but for any alleged bad faith conduct, and that really is the dispositive issue in this case. Now as Your Honors mentioned, the contract at the heart of this dispute was ratified by a vote of 228 in favor and 109 against. That's 119 vote margin. So plaintiffs must at minimum show through non-speculative admissible evidence that an outcome determinative number of voters were affected by the alleged bad faith conduct in this case such that the outcome would have been different but for the bad faith conduct. Do you believe our Anderson case says, I know a lot of Andersons favorable to you, but does that even imply the word, quote, substantial, unquote, member concerns is enough? That you don't have to really show complete vote-by-vote, but you've got to show, quote, substantial, I think substantial is in the opinion several times, member concerns. Sorry. I don't think that that is the legal standard, and if that was the legal standard, I think Anderson would have come out differently. Because in that case, the severance fund that the union allegedly lied to its members about impacted everybody. And there, just like in this case, plaintiffs have said this was a substantial concern. But in Anderson, after a trial, this Court reversed, saying the holding that the outcome would have been different, that the members would have gone on strike, is purely speculative. So it doesn't need to be just a substantial concern amongst the members. There need to be admissible, concrete proof that the outcome would have actually been different. That I think is the key holding in the Anderson case. And here, after three full years of litigation, including a year of discovery and eight weeks of targeted social media advertising about this litigation by plaintiffs' counsel to the union's members on Facebook, only Is this in the record, what you just said? It is in the record. Okay. Proceed. Yep. Thank you. Proceed. Only in response to our summary judgment motion, where we pointed out the evidentiary gaps in plaintiff's causation case, did they finally produce and identify two people who claimed to have voted in favor of this contract without realizing that it contained changes to the pension benefit. And then they submitted declarations from seven others who did not attend the ratification vote, for reasons we don't know, but claimed that if the union had given them advance notice about the changes to the 30 and out, they would have then gone to the ratification vote and voted against the contract. This lawsuit had been going on for three and a half years by the time we got to summary judgment. And plaintiffs have repeatedly characterized this case, and we heard it here again today, that it involved a large block of motivated and angry union members. And Judge Smith, I think you asked the question, doesn't that give us reason to think there would be more than nine people who would have expressed interest in this case? And I think the answer to that is yes. If this were the case that this substantial number, overwhelming number, large block of members truly felt misled about this, we would have more than nine causation witnesses. And these types of cases commonly fail on this element of the analysis, and we've cited a number of those cases in our briefing. Do they need a, do they need to get declarations or affidavits from, you know, here we've got, I don't know what the, what would they need, like a hundred people? Or would it be sufficient to get something less than affidavits and or declarations from each and every one of those people to turn the result? I don't know that we necessarily need to say as a matter of law that only declarations from voters can satisfy causation, but it needs to be admissible, non-speculative evidence of some kind. And here, where it is a secret ballot vote, so there is no record of how individuals voted. Except for the person that lost their ballot. They didn't vote, right? They did not vote, yes. And that's the named class representative. That is the lead plaintiff, Matthew Nagle. Right. Yep. It needs to be admissible evidence of some kind to show as a matter of fact and law that the outcome would have been different. To me, the obvious way to do that is to gather declarations and affidavits from voters, especially where you've got this direct pipeline through Facebook to dozens of them. Supposedly, went out and got it, started a petition, the lead plaintiff or the attorney started a petition, and they got 150 people to sign the petition. And then there's a declaration that said, I went and talked to each and every one of these people and told them what this petition was about. And they all signed it and decided that they were going to vote, said they were going to vote differently. I think you'd have a hearsay issue on that, but I think you're getting closer, certainly, than we have on this record. Substantial, don't you think it's substantial? I looked again. Substantial is many times in our Anderson case. It's a very old case, but it's apparent in the law, right? Even if that were the legal standard or the yardstick we're using here, I think plaintiff's case still fails because of the fact that the changes to the pension benefit that are in dispute here, the changes to the 30 and out, affected just a few hundred people. Is it 448 to 12 percent? It's 448, and while I'm thinking of it, the question was asked whether the record reflects specific detail about individuals who are within this 800 number, the group that plaintiffs have referred to. That information is in the record. It's part of their economic experts analysis of this case. We submitted an Excel spreadsheet generated by that expert to the district court in the class certification proceedings. It has birthdays of everyone in that 800 member group. It has the date they were hired into the retail industry. And it indeed includes people who are about 30 years old right now and who would not achieve the 30 and out benefit until decades from now. In one case we discussed that the class certification motion was a member who would not achieve his 30 years of service credit until the year 2048. Plaintiffs are including people like that in their assessment of this 800. Well, I want to just, I want to follow up on my question, which is I'm a little concerned that having a rule that requires them to get 115 declarations and affidavits is not a very good rule. People could have a lot of reasons for not wanting to sign a declaration. I don't want to get involved. I don't want to be retaliated against by the union, whatever the case may be. And I just wonder whether something like what I suggested might be good enough. Now, we don't have that here, but it sounds to me like you're asking for a rule that they have to have admissible evidence from each and every one of those individuals in order to get past that threshold. Well, they need to have admissible evidence that the outcome would have been different. And my only point was that to me, the clearest way to do that and the best way to get past summary judgment is to get declarations from voters, from potential voters of people who actually voted. Would you concede that the 30 and out issue was a critical one for the election? Not for the entire membership. I would not concede that. And in fact, if it had been, like we've discussed before, if that had been a critical issue, we would have more than nine causation witnesses here today. Certainly. And again, the 30 and out benefit changes impacted 448 people out of a bargaining unit of 3,500. And we're talking about a contract that didn't just change the 30 and out benefit. That was just one element of a very broad labor agreement, which include raises on hourly wages. It included a transition from a defined benefit legacy plan to the variable annuity, which a lot of members were very much in favor for. We saw a lot of discussion about that at membership meetings. So I, getting back to your point, Judge Strauss, when we're talking about causation, I don't think we need to go so far as to issue a ruling that says only declarations signed by members and discussing their voter, their voting intentions and economic interests in the contract can, can satisfy. I think there could be a case out there in the universe where something other suffices. Well, suppose, suppose, I'm going to just give you one more. Suppose we have 30 or 40 affidavits or declarations. And in those affidavits or declarations, many of them say, I know people who would have voted differently, you know, based on my discussions with them, and it would have changed the outcome of the vote. So you don't just have nine. You have a critical mass. Would that have been good enough? Well, I think the law is clear in this circuit and probably every other circuit that those types of hearsay affidavits are not sufficient at summary judgment. And we've cited those cases in our brief. And I, I think that's the proper way to characterize a declaration like that. If I were a plaintiff's counsel in a case where I had a declaration from someone who names others who may be similarly aligned, I would be within the hour talking to those other people. For whatever reason, that didn't happen here or it did happen. And they expressed that they wouldn't have actually voted against the contract. But the fact remains, on this record in this case, the plaintiffs do not have sufficient evidence to prove causation. Even if they Does the record show who signed up on the Facebook page? 167. Is that the right number? That's the right number. I think the, the Facebook group itself, I don't recall the exact number, but it had It's in that range, right? It had about 150 people who joined. Right. But Do you know the names of them? Is that in the record? They are in the record. The membership list for the Facebook group is in the record. It's Okay. Does it include union leadership? I don't know that off the top of my head, but I know that the First name? It is in the appendix, appellant's appendix. Yeah, go ahead. Even if, even if the plaintiffs could establish that the ratification vote would have been different, I think this is very important, even if they could prove that the ratification vote would have been different, they've only done the first step in the dance on causation. They then have to show that their employer would have come back to the table and agreed to provide them whatever alternative really was. This allows a conspiracy by the negotiators, right? And you would allow that. You think the, that would be credible. I missed the first part. I have said the word conspiracy and I used it in the non-legal sense, maybe. But, but this allows the negotiators then to say, oh yeah, if we did that, they would have no hope. Correct? That's your, that's your evidence here. No, I'm sorry. I missed the first part of your question. Okay. Well, we'll try again. Sorry about that. Yeah. Oh no. No, I may not be being clear, but my question is a simple one. And I know that, I know what your argument is in the briefs, but doesn't it allow the negotiators then to say that they wouldn't have agreed to anything else? That the employers wouldn't have agreed to anything else? Yeah. Um, certainly they could say that if that was their experience in bargaining. Um, here, the record is clear because plaintiff's counsel deposed Super Values' chief labor negotiator, Tracy McDonald, and asked them. And I meant negotiators. I meant for both. That's why I said the word conspiracy. Oh, uh, the union to conspire with the employer. Yeah. I mean. Yeah. Against a part of the union that wants to be the majority. Proceed. I, I, I can see where you're going with on that. Certainly we don't have any such facts here. In fact, the, as I was saying, the lead negotiator for Super Value testified in his deposition when he was specifically asked about the employer's intentions with early retirement benefits, he said that they assumed from the beginning that the 30 and out would be eliminated because of the funding issues that the plans were going through and they needed to address the funding issue. That's direct from, from the lead negotiator for Super Value. So this idea that even if the ratification vote had been flipped, the employers would have agreed to provide something else, some other alternative early retirement benefit, which by the way, has never been defined, is complete speculation. So even if we were to grant plaintiffs that they could show the outcome of the vote would have been different, their case still fails on causation. And I see I'm running out of time. I'll reserve the rest. Thank you. Well, you're, you can use all of your time. You're. Oh, okay. You're the appellee. Then it's up to you. You're, you're the controller of it. While we're here. And since we, we raised the term conspiracy, why don't we follow up on that? Because one of, one of the things that we have heard over and over in this case is that there was a union conspiracy to conceal information from members about the changes to 30 and out, that's really the core bad faith allegation in this case, and it fails because it's unquestionably contradicted as a matter of undisputed evidence in the law. And we've just described the union membership meeting conversations that leadership had with members for about two years prior to the negotiations in this case, you'll find that at pages 25 through 27 of our brief, where there were several conversations about the plan's funding problems, about the fact that the parties would be bargaining for changes to the plan, the fact that changes may include changes to the 30 and out benefit. That was discussed at numerous meetings, not only by union leadership, but the union leadership invited its pension plan administrator, Matt Winkle, to come and explain that to the members. Anybody who attended that meeting would have known what was going on. And because not everybody goes to membership meetings, more than a month before the ratification meeting, the union president sent a letter to all pension eligible members explaining that exact same thing, that they were bargaining for changes to the plan and that it may include changes to early retirement benefit. So the fact, this idea that there was a conspiracy to withhold that is simply not true, and it's contradicted by the undisputed facts. Thank you, Your Honors. Thank you, Mr. Lawrence. Mr. Moriarty, your rebuttal. Thank you. I want to correct originally some issues with the record. Opposing counsel represented that it's undisputed that written materials were provided to members during the ratification. That is not so. It is highly disputed. Based on testimony from multiple appellants, based on testimony from Mr. Keith Rodewald, who is a member, but not a class member in this case, from Mr. Moore, written materials were not made available and there was no explained, well-explained or easy to read resource available. The testimony that opposing counsel is citing came in over objection and requires inferences in the union's favor. With regard to the Anderson case, we agree with Judge Benton that a substantial issue is one that potentially elevates a question to the point where there's a causation, and the thing that particularly distinguishes this case from the record that was before the Court in Anderson is that the severance pay benefit at stake in Anderson did not exist and had not existed, and the representations that were being made to the members, those members never took any further steps to verify the existence of that benefit. The record here is drastically different.  Let me ask you this, though, with the Chief's permission, even if we had a critical mass rule or substantial, you know, this is a substantial issue, nine people out of hundreds, I mean, it just, it seems to me that we could almost assume without deciding that some of these rules apply, you know, whether it's a substantial issue, and on this record, the plaintiff still loses. Tell me why I'm wrong about that. Your Honor, I think this goes to the line of questioning that you raised beforehand about what evidence is going to be enough evidence to show that there was a critical mass of members that were going to change their minds. And here we have 13 separate declarations and how they would lobby their friends and family. We have the Facebook group. Opposing counsel stressed, and there was a lot of colloquy about, well, what declarations are enough? How much information is going to be enough? Is this judicially implied standard going to require a polling of every single member to see what their sentiments are on this point? Our view is that the record that was put before the Court is sufficient to create that issue of material fact. And to the extent that there are questions about hearsay, the hearsay rule does not apply. We are not bringing these declarations in front of the Court for the truth of the matter being asserted that it is being offered to show state of mind, which is a classic exception. And it's precisely what we need to do in this case is not to necessarily determine everybody's hypothetical vote on a hypothetical CBA based on what would have happened had there been no misrepresentations to the membership as a whole. It is to determine whether there's enough people who would have been swayed on this particular issue to reach a different outcome. And there's reasonable evidence to support that inference here. My ---- Roberts.  Thank you, Your Honor. Thank you, counsel.